# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs November 28, 2012

## IN RE TIMOTHY W. H. ET AL.

**Appeal from the Chancery Court for Lawrence County**
**No. 15571     Jim T. Hamilton, Judge**

---

**No. M2012-01638-COA-R3-PT - Filed December 7, 2012**

---

The father of two minor children appeals the termination of his parental rights. The trial court found three grounds for termination: abandonment for failure to pay child support; failure to comply with the permanency plan; and failure to remedy persistent conditions. The court also found that termination of Father's parental rights was in the best interests of the children. Finding no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

M. Wallace Coleman, Jr., Lawrenceburg, Tennessee, for the appellant, Timothy W. H., Jr.

Robert E. Cooper, Jr., Attorney General and Reporter, and Martha A. Campbell, Deputy Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

Timothy W. H., Jr. (Father) and Hannah Alicia L. (Mother) are the parents of Timothy W. H., III ("Timmy") (born December 2008) and Emma K. F. H. ("Emma") (born September 2009). Mother and Father married in 2008, not long before Timmy was born. They were living in Eva, Morgan County, Alabama at the time. They moved to Decatur, Alabama not long after Timmy was born and lived in Decatur for about a year and a half. They moved to Tennessee prior to Christmas of 2009. When they first moved to Tennessee, they lived with Father's mother, stepfather, and his stepfather's mother.

In March of 2010, DCS investigated a complaint that Emma, then six months old, was medically neglected. Shortly thereafter, Mother and Father separated; Mother moved back to Alabama to live with her father and she left the children in Father's custody. Mother and Father were divorced in May of 2010. Father then moved to a trailer park in Lawrenceburg where he lived with a fifteen-year-old girl named Holly and her parents. Father, who stated later that he believed Holly was around eighteen years old, engaged in a sexual relationship with Holly.

Father was subsequently charged with felonious statutory rape; he pled guilty to that charge on January 4, 2011 in Lawrence County. Father was placed on two years probation for that offense, and was still on probation at the time of the trial on May 2, 2012. He also pled guilty to possession of marijuana for resale, a felony, on January 4, 2011. Father received two years probation for that offense. Due to the statutory rape charge, Father is on the sex offender registry in Tennessee.

On August 10, 2010, Timmy and Emma were removed from Father's custody and placed in the custody of the Department of Children's Services ("DCS") due to Father living with and having a sexual relationship with a fifteen year old. The removal was also due to Emma not being properly nourished and being diagnosed with failure to thrive. The Lawrence County Juvenile Court issued an emergency protective custody order placing the children in temporary State custody on August 10, 2010, adjudicated the children dependent and neglected on September 15, 2010, and an order finding the children dependent and neglected was entered on November 16, 2010 in the Lawrence County Juvenile Court.

The children have been in foster care continuously since the August 10, 2010 protective custody order and they have lived in one foster parent home with Josh and Tammy S. since coming into DCS custody in August of 2010.

DCS filed the Petition to Terminate Parental Rights on October 21, 2011. The trial on the termination of Mother's and Father's parental rights was held on May 2, 2012, in the Chancery Court for Lawrence County. Both Mother and Father were represented by their own counsel. A final order terminating both parents' rights was entered on June 22, 2012. Father timely filed a notice of appeal on July 20, 2012; Mother did not appeal.

STANDARD OF REVIEW

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006). Nevertheless, parental rights may

be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The petitioner has the burden of proving that there exists a statutory ground for termination, such as abandonment or failing to remedy persistent conditions that led to the removal of the child. *See* Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. Only one ground need be proved, so long as that ground is proved by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition to proving one of the grounds for termination, the petitioner must prove that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child).

Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (no Tenn. R. App. P. 11 application filed) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

**OPINION**

### I. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

The trial court found three grounds upon which Father's parental grounds may be terminated provided that termination of his parental rights is in the best interests of the children. We discuss each of these grounds below.

### A. NONCOMPLIANCE WITH THE PERMANENCY PLANS

Tennessee Code Annotated § 36-1-113(g)(2) authorizes termination of parental rights for failure to comply with a parenting plan. In order for noncompliance to justify the termination of parental rights, it must be "substantial." *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008). In conjunction with

terminating a parent's rights on the ground of substantial noncompliance, the trial court must find that the requirements of the permanency plan that the parent allegedly did not satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed de novo with no presumption of correctness. *Id.* at 546.

A permanency plan was created for each child; the initial meeting to develop the plans occurred within a week after the children came into DCS custody. Both parents attended the initial meeting. After the August 18, 2010 preliminary hearing, Ms. Kim Jennings, a DCS Family Service Worker, informed them that the permanency plan meeting would be on August 26, 2012. The first permanency plan meeting was held on August 26, 2010 and the permanency plan was developed at that time; both parents were notified of this meeting but they did not attend. The permanency plans list a number of requirements that Mother and Father needed to satisfy before the children could safely be returned. The plans required both parents to pay child support for the children while they were in DCS custody; provide safe, stable housing for the children; maintain income to support the children; refrain from incurring additional criminal charges; participate in an alcohol and drug assessment, parenting assessment and mental health assessment and follow all recommendations; and successfully resolve all involvement with the Alabama Department of Human Resources. The permanency plan also required that all paramours complete alcohol and drug assessment, parenting and mental health assessments, and follow all recommendation. The juvenile court ratified the initial permanency plans on November 17, 2010, and Ms. Jennings mailed a copy of the plans to both parents.

The permanency plans were revised on December 9, 2010. The revised plan reiterated the requirements in the initial plan and added the following responsibilities: that Mother and Father attend regular medical appointments for the children; that they acquire and maintain medical insurance for the children; that they come to Tennessee at least two times per month to visit the children at least two hours each visit; that they provide a safe and stable home for the children free of abuse; that all legal issues be resolved and no new legal issues incurred; and that they have homes that will pass an Interstate Compact on the Placement of Children ("ICPC") home study. The permanency plans stated that the children are not bonded to the parents due to lack of visitation. The December 9, 2010 permanency plans also added the alternative goal of adoption. Neither parent appeared when the December 9, 2009 plans were developed.

On January 29, 2011, Father had his first supervised visit with the children. During that visit, Ms. Jennings went over the permanency plan developed on December 9, 2010 with

Father. She explained to him that adoption was added as an alternative goal due to the lack of visitation with the children, and that the lack of visitation was a serious concern for DCS. Father told her that he understood, that he was now with a good woman, and had a good job and a good home, and that he would be visiting regularly. Ms. Jennings also gave Father a copy of the Criteria and Procedures for Termination of Parental Rights and the permanency plans. Ms. Jennings went over the criteria with him section by section, including the section on abandonment. The criteria addressed abandonment, lack of concern, substantial non-compliance with the permanency plan, and persistent conditions. Father signed the criteria on that date.

On June 9, 2011 Father married a lady named Heather who has two children. He lived with Heather and her children from June of 2011 until February of 2012. Father and Heather were separated at the time of the trial; the separation was precipitated by the fact the Alabama DHR removed Heather's children and would not return the children to their mother, Heather, while Father was living in the home, because he was a sex offender.

The permanency plans were revised again on August 11, 2011. The plans reiterated the requirements of the December 9, 2010 plans, and added the following: that the parents will contact DCS two times a month to see if the children have medical appointments; that Father and his new wife participate in co-parenting through their parenting provider; that the parents work with the parenting instructor no less than three times a month; that the parents be able to demonstrate the parenting skills they learned during the visitations with the children; that the parents cooperate with Alabama DHR and the ICPC home study process; that Father participate in anger management and address his Post Traumatic Stress Disorder (PTSD) with his counselor; that Father address his grief issues regarding the death of his eight week old child due to SIDS; that he have his mental health intake scheduled by August 19, 2011; that Father provide DCS with the contact information for his probation officer by August 31, 2011; that Father continue his alcohol and drug treatment and meet with the provider no less than three time a month; and that he follow the recommendations of his alcohol and drug assessment and schedule a mental health intake to rule out the need for further tests, substance abuse and PTSD by August 19, 2011. Father signed the August 19, 2011 permanency plans. Ms. Susie Kelley, DCS Family Service Worker, reviewed the plans with Father and gave him copies; she also cautioned him that he needed to pay child support. She also went over the Criteria and Procedures for Termination of Parental Rights with Father on August 11, 2011, she addressed every section with him and asked him if he had any questions about it. He signed the criteria and she gave him a copies.

With regard to visitation, Father admitted at trial that he did not visit his children during the first five months they were in custody, except for meeting the foster parents with the children in Florence, Alabama, in November, 2010. He admitted he did not see them in

August, September or October of 2010 and explained that this was because he would have to miss work driving back and forth to Tennessee. Father missed two supervised visitations in October of 2010 and January 2011. Ms. Jennings testified that she offered Father visitation in January of 2011 as the children had not seen their parents in months and they were not going to know them. With her assistance, Father had a supervised visit on Saturday, January, 29, 2011. During this visit, Father's girlfriend and her children were in the car, and Father kept going to the car to smoke and check on them; he left the children alone in the visitation area as he did so. Ms. Jennings explained to him that he should not leave the children unattended.

DCS arranged therapeutic supervised visits for Father at Arnell's Counseling. Ms. Kristie Howell worked at Arnell's and arranged for the therapeutic visitation from March of 2011 until August of 2011. Father had two visits in March of 2011 and none in April; he explained that he worked at different locations and also attended college Tuesday through Friday nights. Father told her he wanted to visit on Saturdays and Sundays but that was in conflict with her schedule and DCS is not open on those days. In May of 2011 he had one visit; in June of 2011 he had one visit. During the first visit the children were reluctant at first, but Father was able to interact with the children. His last supervised visit with Ms. Howell was on June 17, 2011. Ms. Howell testified that Father's interaction with the children was good during the visits but short, they only lasted two hours and, on occasion, he brought inappropriate food, such as cookies for breakfast. Further, she said Father did not consistently bring diapers and wipes. Ms. Howell also testified that she advised Father that he could have two supervised Saturday visits on April 16, 2011 and April 30, 2011, to accommodate his desire for weekend visitation. However, Father did not come on April 16, 2011, he explained he had spent so much money on his stepdaughter's birthday. Father also cancelled the April 23, 2011 visit as he had made other plans.

Father never obtained suitable housing for the children. Although he insisted that he had a safe and stable home, and denied interfering with the Alabama DHR home inspection, the evidence presented at trial proved otherwise. Because of concerns with Father, the Alabama DHR wanted to take law enforcement with them when they went to Father's home to do the home study; Father refused to allow law enforcement in his home so the home study was never completed. According to a letter from the Cullman County, Alabama, DHR, dated November 14, 2011:

> The home study for [Father] is being denied. [Father] has allegedly made threats against a Social Worker in the past. [Father] told Suzy Kelly, Tennessee Department of Children's Services Social Worker that he had made threats to the worker and had a gun on the table. [Father] told Michele Cash, Cullman County Department of Human Resources Social Worker that he had

a gun on the table but did not point it at the Social Worker. [Father] denied to me initially that he made any threats and later said only that he had not pulled the gun on the Social Worker. [Father], a registered sex offender, has been reluctant to allow law enforcement to be in his home during the completion of the home study. [Father] was informed on 11/7/11 that he and his wife would need to submit to a background clearance. [Father] said he would not agree to a background clearance until he had gotten approval from his attorney. As of this date [Father] has not been in compliance and therefore a home study can not be completed.

Father did not address his mental health issues. He denied having a diagnosis of PTSD but admitted to being prescribed medication for stress. He went to the Cullman Mental Health Center in Alabama where he saw a therapist once and saw a mental health specialist for a while. He testified that he went for mental health assessments until the end of 2011 but had not made an appointment for a therapist since that time. His excuse was that he was working a full-time job and could not leave work so he had not done it. Father also admitted having appointments in January and February of 2012 but did not appear.

When Ms. Arnell of Arnell's Counseling tried to set up a mental health assessment Father informed her that he could not make the appointments as he was working and in school and it cost too much to drive. The personnel in Cullman closed his case because Father did not attend the last two sessions.

Father was still on probation at the time of the hearing; he had not completely addressed his legal issues with the Alabama DHR as his stepchildren had recently been removed from his home. He never completed co-parenting and his wife never scheduled their joint counseling.

This record reveals that DCS exerted reasonable efforts to help Father satisfy the requirements in the permanency plans. DCS workers met with him and discussed the permanency plans and criteria for termination of parental rights. They scheduled visitation for him and provided therapeutic visitation for him, including parenting session. DCS requested the home study for his home. They provided him with an alcohol and drug assessment and anger management session. They offered co-parenting counseling to him. They requested mental health assessment for him to address his PTSD and to follow through with all recommendations. The record also reveals the requirements Father failed to satisfy were reasonable and related to remedying the conditions which necessitate the removal of his children and their placement in foster care.

We therefore affirm the trial court's finding that Father failed to substantially comply with the requirements of the permanency plan.

## B. PERSISTENCE OF CONDITIONS

Tennessee Code Annotated § 36-1-113(g)(3) specifies the essential elements for the "persistent conditions" ground for termination of parental rights. It provides that grounds for termination exist when:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) . . . , still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) . . . in the near future; and

(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . .

*Id.*

The evidence in this record, which we summarized earlier in this opinion, clearly and convincingly established that Father made no material changes to the conditions that existed when the children were removed in 2010; that there is little likelihood that these conditions will be remedied at an early date so that the children may be safely returned to Father in the near future; and that the continuation of the parent and child relationship greatly diminishes the childrens' chances of early integration into a safe, stable and permanent home. For these reasons, we affirm the trial court's finding that DCS proved the "persistent conditions" ground for termination of Father's parental rights by clear and convincing evidence, pursuant to Tennessee Code Annotated § 36-1-113(g)(3).

## C. Abandonment by Failure to Support

We now turn our attention to the ground of abandonment for the failure to support. Father admits he did not provide support for the children; however, he contends the evidence does not clearly and convincingly prove that he wilfully failed to pay child support.

For purposes of terminating parental rights of a parent, "abandonment" means:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).

To find abandonment by failure to support, it must be established that the failure to support was "willful." *See In Re Swanson*, 2 S.W.3d 180, 184–85 (Tenn. 1999). Failure to pay support is "willful" if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *In Re J.J.C.*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004). The fact the parent was not under an order to pay support is not dispositive of the question of whether the failure is willful; the obligation to pay support exists in the absence of a specific order. *Tenn. Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004).

Father knew the consequences of his failing to support his children, including that failure to support his children during the four months preceding the filing of the petition to terminate parental rights would be a ground for termination of his parental rights, because he signed the Criteria and Procedures for Termination of Parental Rights. Further, the record reveals that Ms. Kelley spoke with Father on several occasions about the importance of paying child support and that she told Father he needed to pay child support, she gave him numbers and told him he needed to call and make arrangements to pay child support. Nevertheless, Father admitted at the May 2, 2012 trial that he had not paid child support since his children were removed in August of 2010, he also admitted that he has not been incarcerated during this period of time, and he admitted he did not pay child support for the four consecutive months prior to the filing of the Petition to Terminate Parental Rights on October 21, 2011. Additionally, the foster mother confirmed that they never received child support from Father. The DCS workers confirmed that he had not paid child support as well.

-9-

As for his ability to pay support, Father was employed from the time his children went into state custody in August of 2010 through the filing of the Petition to Terminate Parental Rights in October of 2011, until the time of trial in May of 2012. When the children were removed in August of 2010 he was doing odds and ends to earn money. When he moved back to Alabama at the end of 2010 he had two jobs, working at Absher Construction and Sonoco. He did retail maintenance for Absher Construction and earned about $7.45 per hour. He worked thirty to forty hours per week at Sonoco building wooden reels for wires for minimum wage. He later worked at Golden Rod, a chicken plant. At the time of trial he worked forty hours per week at Southern Energy Homes building trailers making $9.60 per hour.

Considering the foregoing and the entire record, it has been clearly and convincingly established that Father was aware of his duty to support the children, that he had the ability to provide support and that he wilfully failed to do so. We therefore affirm the finding that Father abandoned the children by failure to support.

## II. BEST INTERESTS OF THE CHILDREN

The Tennessee General Assembly has provided a list of factors for the court to consider when conducting a best interest of the child analysis. *See* Tenn. Code Ann. § 36-1-113(i)(1)-(9). The nine statutory factors, which are well known and need not be repeated here, are not exclusive or exhaustive, and other factors may be considered by the court. *See In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Moreover, not every statutory factor need apply; a finding of but a few significant factors may be sufficient to justify a finding that termination of the parent-child relationship is in the child's best interest. *See In re M.A.R.*, 183 S.W.3d at 667. The child's best interest is to be determined from the perspective of the child rather than the parent. *See State Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *7 (Tenn. Ct. App. Dec. 3, 2007) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

Kim Jennings, the DCS Family Service Worker, testified that when the children came into custody in August of 2012, they were small for their age, thin and pale. Emma hardly had any hair, even though she was nine or ten months old at the time. Presently, their condition is that they are much more sociable. Their faces have filled out and their coloring is better. Timmy has started to talk, and he would not talk to Ms. Jennings at the time he came into custody. Ms. Kelley testified that she has observed the children in the foster home. The children react to the foster parents just like they are family, they love their foster family, and the children are very attached to them.

The children have lived with their foster parents since they came into custody in August of 2010. Josh S., the foster father, has been employed as a paramedic for a nearby county EMS for the past twenty-two years, his wife works as a nursing home administrator, and they have two teenage daughters and the girls get along with the children just like they are their brother and sister. The girls bathe the children, feed them and do sisterly chores for them. The children call the foster parents mama and daddy. Mr. S. testified that he feels about them like they are his own children, he has a close bond with them and he loves them. When he pulls into the driveway they run out the back door after him.

Mrs. S., the foster mother, also testified that her teenage daughters spend a lot of time with the children. They play with them, read to them, help them get their baths and feed them, and get them to bed. Mrs. S. loves them like they are her own biological children and they want to adopt the children if they become available for adoption.

In this case, the evidence clearly and convincingly established that Father failed to make an adjustment in circumstance to make his home(s) safe for the children, *see* Tenn. Code Ann. § 36-1-113(i). Further, to allow the children to return to Father, which could not be considered until he makes numerous positive changes and becomes a responsible parent, which Father has repeatedly failed to do, would subject the children to more uncertainty and instability. Moreover, it would require the removal of the children from the only home they has ever known and where they are happy, healthy, and thriving. *Id.* § 36-1-113(i)(5).

Considering these relevant factors from the childrens' perspective, the evidence clearly and convincingly established that it is in the childrens' best interests that Father's parental rights be terminated.

### IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Timothy W. H., Jr.

_____
FRANK G. CLEMENT, JR., JUDGE